708 A.2d 429

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. SCOTT BAKER, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1998—Decided April 16, 1998.

Before Judges PRESSLER, CONLEY and WALLACE.

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for appellant (*Peter Verniero,* Attorney General, attorney; *Ms. Foddai,* of counsel and on the brief).

*Ernest G. Ianetti* argued the cause for respondent (*Mr. Ianetti* and *Patrice M. Renner,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

This is a capital case in which defendant Scott Baker was found guilty of both purposefully and knowingly causing serious bodily injury resulting in death while demonstrating reckless indifference, *N.J.S.A.* 2C:11-3a(1) and (2), and felony murder, *N.J.S.A.* 2C:11-3a(3), as well as other related crimes. Because of the extraordinary and untoward events that followed the conclusion of the guilt-phase trial—events that involved prosecutorial misconduct found by the judge to have substantially prejudiced defendant's right to a fair penalty-phase trial—the judge, on defendant's application, entered an order precluding a penalty-phase trial and thereby, in effect, depriving the Prosecutor of the further opportunity to seek the death penalty. The guilty verdict was not, however, affected. The State appeals from the preclusion order, and we affirm.

This is what happened. The capital charges against defendant were based on his participation in a robbery of the elderly victim, Beatrice Baskin, in her home and his conduct in allegedly stabbing her to death. There was no physical evidence linking defendant to the crime. The State's case rested upon the testimony of defendant's alleged confederates in the robbery scheme, Scott Barnes and Eric Lewis, who had entered into plea agreements with the

State and who testified that defendant had wielded the knife that had inflicted the fatal wounds. The trial lasted six weeks, and the jury deliberated for four days before returning its verdict finding defendant guilty of all charges. The verdict was returned on July 8, 1997. The jury was not discharged since it was to proceed with the penalty phase on July 15.

On July 10, 1997, an article appeared in the local newspaper reporting the substance of the jury's guilt deliberations. The article began as follows:

> It was all there in black and white after a jury convicted Scott Baker of murdering Beatrice Baskin.
>
> The jurors made a list, with two columns on it. They left it in the jury room.
>
> They wrote down many reasons for convicting Baker, 25, of stabbing the 75-year-old Brick Township woman to death while robbing her.
>
> High on the list was testimony of Scott Barnes, 25, formerly of Manchester Township, who said he drove Baker to Baskin's house so he could rob her the night she was killed.
>
> And they wrote down two reasons for acquitting him: Eric Lewis, the ineffective state's witness, and the lack of physical evidence linking Baker to the killing.

On July 11, 1997, the date that had been set for a pre-penalty phase conference, Judge Turnbach advised counsel that he was conducting an inquiry to determine how the press had obtained access to the jury material, material that he described as "records prepared by the jury, lists setting forth the manner in which its deliberations had proceeded and the manner in which they arrived at the conclusion that they arrived at." On July 15, the judge reported the results of his inquiry and granted defendant's motion for a mistrial that had been made in the interim. In sum, the judge was satisfied that the County Prosecutor had seen the jury material in the jury room and had reported the content of this material to the press.[1] These, in part, are the judge's findings and conclusions:

---

[1] We note that the State argued, in response to the double jeopardy motion, that the judge had not previously "clarified" what the County Prosecutor had done or how the information got to the press. The judge corrected the State's misimpression on these matters, stating first that "I thought it was clear that I

At this point I must and will address the legal ramifications of the issue that have caused defense counsel's application and the prosecutor's response thereto. It is necessary that the record reflect same and that the public understands what is occurring here.

. . . .

In the usual course of events, the next part of the trial would be what is commonly referred to as the penalty phase, a phase about which I will have more to say shortly. First, however, two things must be noted.

One, the problem which has arisen here occurred after the jury returned its verdict in the guilt phase, and in no way affects that verdict.

Second, as a result of the jury's verdict in the guilt phase, the trial was not concluded; it was ongoing. The jury was still impaneled and the Court and jury were still in session, or trial, if you will. The problem arose at this juncture.

. . . .

The jury, during its guilt phase deliberations, prepared charts crystallizing its thought processes and the factual findings underpinning its conclusion. After the jury returned its verdict and was excused to return this week for the next phase, it left these charts hanging on the wall of the jury room.

At that particular time, I recall very distinctly and clearly Assistant Prosecutor Cunningham asking me if the State could take possession of its exhibits pending the next phase of the trial. There being a hundred and sixty some exhibits, the application was appropriate. Obviously, we would not just leave the State's

---

indicated that the prosecutor walked into the jury room and viewed the jury's charts and its deliberative thoughts," and then that "I thought I indicated on the record that the prosecutor spoke with the newspapers." Although the State disputed the judge's recollection, the quoted portion of the judge's findings makes plain that his recollection was entirely accurate. Lest there be any question regarding these critical findings, we rely on the following statement made by Judge Turnbach at the argument on the double-jeopardy motion:

Counsel for the State Attorney General has requested the Court to conduct a fact-finding hearing to state the factual basis on which I granted a mistrial on July 15, 1997. I fail to see any purpose which would be served by such a hearing. As the transcript of the proceedings on July 11, 1997 indicates, I conducted an inquiry with regard to what occurred. This was done with the approval of counsel. As part of my inquiry, I spoke with the then Ocean County Prosecutor. On July 15, 1997 I placed on the record, in the presence of all counsel, the facts developed on my inquiry. Neither counsel for the State, at that time, Mr. Cunningham, nor counsel for defendant expressed any disagreement with my factual findings or conclusions. I would note that they were all witnesses as to what had occurred.

exhibits or the defense exhibits just sitting here. And I indicated to the Assistant Prosecutor that, yes, he could, but first he must allow the Court Clerk to go into the jury room and see to it that everything is in order.

While the Court Clerk was in the process of assembling the various exhibits to return to counsel and before the Court Clerk could remove and secure the jury's charts, they were observed, and the person who observed them shared their observations with a reporter who printed them.

I want to make it clear that the reporter's actions were not wrong which occurred here. Indeed, they were the vehicle by which the wrong came to light and to the Court's attention.

The wrong was in the observations and mental recordation of the charts' contents. For, you see, the State would now be in a position to meet its burden with knowledge of the exact path followed by this jury in its guilt phase determination. The State's burden would be greatly diluted.

In view of that, there is no way that I could allow this jury to decide the penalty phase issue in these circumstances. I am not indicating that Mr. Cunningham would seek to take undue advantage of what was observed, and, in fact, I'm making it very clear that Mr. Cunningham is not the person who made this observation or the mental recordation, nor was Mr. Miller, Mr. Bowman, or Mr. Ianetti. All trial counsel had nothing to do with the problem that arose.

But the fact of the matter is, the mental recordation and observation was made by the head of the Prosecutor's Office, and that knowledge will therefore have to be attributed to the State, and even though I would fully agree that Mr. Cunningham would not seek to do anything untoward or take advantage of that, the fact of the matter is, the issue exists, it is there, and the public and the defendant and everyone else would always wonder about whether the observation had to do with the final jury result. This is something in a capital proceeding that this Court could not tolerate or permit to occur.

Additionally, I don't find that there was a malevolent or evil intention by the person who made the observation. It was done innocently enough, but it cannot be held innocent in view of the ramifications of it. It was something that shouldn't have been done and the person observing it should have known better.

As I say, I find no malevolent spirit, but the fact of the matter is, that doesn't really go to the issue. The issue is whether the jury's deliberative processes were invaded, and they were, and whether that was innocently or malevolently is really of no concern. The fact of the matter is, is the results.

So I'm going to grant the motion for a mistrial in the penalty phase.

Having thus concluded that the guilt-phase jury could not continue with the penalty phase, the judge then directed the State to consider its position and advise him whether it would seek to impanel a new jury for the penalty phase or "proceed in another direction." In due course, the State advised the judge that it would seek to continue the prosecution by impaneling a new jury

for the penalty phase, and further prosecution was taken over by the Attorney General from the County Prosecutor. The State also reduced the number of aggravating factors on which it proposed to rely, citing only *N.J.S.A.* 2C:11–3c(4)(f) and (g) (escaping detection or prosecution for another offense and engaging in flight after committing robbery). Defendant moved for preclusion of the death penalty on the ground that its imposition would constitute double jeopardy.

Judge Turnbach granted the motion on double-jeopardy and fundamental-fairness grounds, finding that defendant would be prejudiced by proceeding to a penalty-phase trial with a new jury. In evaluating that prejudice in the context of a capital case, the judge cogently pointed out:

> This is a death penalty case and calls for enhanced scrutiny and vigilance considering that the State, as representative of the people, is seeking not to imprison the defendant, but to humanely extinguish his life. The admonition of Justice Story, in the early double jeopardy decision of the U.S. Supreme Court, *United States v. Perez*, [9 *Wheat.* 579], 22 *U.S.* 579 [6 *L.Ed.* 165] (1824) at page 580, bears due consideration: "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner."

The judge was also quite specific in delineating the nature of the prejudice defendant would suffer by having a new jury for the penalty phase. He noted first that the guilt-phase jury had included three African–Americans, defendant also being African–American. He noted further that African–Americans make up only 2.3 percent of Ocean County's prospective juror pool, that the number of African–Americans on the guilt-phase jury was an "extremely unusual occurrence" not likely to be repeated, and that the original jury selection process, which had consumed five weeks, had been conducted with the aid of an expert jury consultant whose role, because the evidence of guilt was sufficient, "was to select a jury not to acquit, but to spare the accused's life." Judge Turnbach also found that not only would defendant thus lose "his carefully selected jury" without the prospect of reproducing it, but he would also lose "his highly competent and experienced counsel." With respect to counsel, the judge pointed out that while defendant's family had originally retained private coun-

sel, that counsel had advised the court prior to the original jury selection that he was providing his services *pro bono* with the investigative assistance and ancillary services of the Public Defender's Office since, because of the complexities and time involved in a capital case, representational costs were beyond the family's means. The difficulty was that counsel had explained to the judge that he would be unable to continue with the case if a new penalty-phase jury were to be impaneled, a process anticipated to take about ten weeks, and Judge Turnbach indicated that under the circumstances he would, in all likelihood, grant counsel's request to be relieved.

Judge Turnbach found another basis of prejudice as well. First, he noted that the State's case was not without "warts," in that "[s]everal of the State's witnesses were less than truthful and some of its police work less than expected in a case of this nature." The judge's concern was that a new penalty-phase jury would be unaware of these matters, the State's case would be thereby "sanitized," and defendant's life or death issue would consequently be decided by a jury that "will never have any residuum of doubt or nagging questions created by the incisive cross-examination of these witnesses." We are in full agreement with Judge Turnbach's implicit observation that while a jury may be sufficiently satisfied with the proofs to find guilt beyond a reasonable doubt, its imposition of the death penalty is an entirely different matter, likely to be influenced by any perceived weakness in the State's case.

With respect to the nature of the Prosecutor's conduct that had placed defendant in this prejudiced post guilt-phase position, Judge Turnbach reiterated his original finding that although he was ascribing no "malevolent or evil intention," nevertheless that conduct constituted "an act of inexcusable neglect which invaded the jury's deliberative process," committed by a person "who should have known better." He concluded that "for the defendant to be placed in his present situation as a result of the inexcusable neglect of the county's chief prosecuting attorney offends princi-

ples of fundamental fairness." He was thus persuaded that whether or not the Prosecutor's conduct met the double-jeopardy standard of provoking a mistrial, it was sufficiently egregious, in view of the resulting prejudice to defendant, to invoke a fundamental-fairness bar.

In considering the State's appeal from the order precluding a penalty-phase trial, we point out first that it does not challenge Judge Turnbach's determination that he was compelled to discharge the guilt-phase jury by reason of the publication of the offending article and the revelation of the Prosecutor's role in that publication. Nor, we are convinced, could it reasonably assert such a challenge. The gravity of the insult done by the Prosecutor not only to defendant and the original jurors but also to the integrity of the system of administering justice is made clear by Chief Justice Weintraub's explanation of jury secrecy in *State v. LaFera*, 42 *N.J.* 97, 106–107, 199 *A.*2d 630 (1964):

> A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out. "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States,* 289 *U.S.* 1, 13, 53 *S.Ct.* 465 [469], 77 *L. Ed.* 993, 999 (1932 [1933]). Some will recall the furor a few years ago when a jury's deliberations were secretly recorded, notwithstanding that the recording was made in a controlled study and the anonymity of the individual juror was completely assured. Ferguson, "Legal Research on Trial," 39 *J. Am. Jud. Soc'y* 78 (1955).

> For the juror's individual protection, the law raises a privilege against disclosure of his communications during deliberations, a privilege which will yield only to some greater public need. 8 *Wigmore, Evidence* (McNaughton rev.1961) § 2346, p. 678; *Clark v. United States, supra* (289 *U.S.* 1, 53 *S.Ct.* 465, 77 *L. Ed.* 993). It is true that no settled rule bars extrajudicial, post-trial disclosures by a juror of his own views even though in cases of public interest the trial judge not infrequently cautions against such disclosures. Yet one of twelve may not be able to disclose his own part without revealing something the other jurors are entitled to have protected. Moreover the public too has a stake in the promise of secrecy to insure free debate in cases to come. In these circumstances it is appropriate to protect all the jurors against efforts of others to browse among their thoughts in search of something to invalidate their verdict.

It is in the context of the magnitude of the prosecutorial misconduct here and the prejudice it has caused defendant that we consider the State's challenge to the ensuing preclusion order.

We understand the State's argument to be based essentially on the standard customarily informing the double jeopardy consequences of a mistrial. It asserts simply that prosecutorial misconduct provoking a defendant into moving for a mistrial does not, under double-jeopardy principles, bar a retrial unless the court finds that the Prosecutor acted deliberately for the purpose of goading the defense into making the motion. Thus, it urges, since the judge here declined to make that finding, further proceedings are not barred. We have no quarrel with the proposition of law. *Oregon v. Kennedy,* 456 *U.S.* 667, 676, 102 *S.Ct.* 2083, 2089, 72 *L. Ed.*2d 416, 424–425 (1982); *State v. D'Amato,* 218 *N.J.Super.* 595, 602, 528 *A.*2d 928 (App.Div.1987), *certif. denied,* 110 *N.J.* 170, 540 *A.*2d 169 (1988); *State v. DeMarco,* 211 *N.J.Super.* 421, 424, 511 *A.*2d 1251 (App.Div.1986). The fact of the matter, however, is that that legal principle is not, in the circumstances here, either apposite or dispositive.

To begin with, we have doubts that mistrial/double jeopardy principles apply at all or offer here a relevant analytical framework. We understand that defendant's original motion following publication of the article was styled as one for a mistrial. But that is not, functionally at least, the relief sought. That is to say, the jury had already returned its guilty verdict. That phase of the trial was complete, and all parties acknowledge that what happened thereafter had no capacity whatsoever to impugn the integrity of that verdict. The issue was only whether that same jury should then continue with the penalty phase. The statute does not mandate that the guilt-phase jury do so, *N.J.S.A.* 2C:11–3c(1) providing that in the ordinary course the same jury is to try both phases but that "for good cause, the court may discharge that jury [guilt phase] and conduct the proceeding [penalty phase] before a jury empaneled for the purpose of the proceeding." The issue before the court on defendant's first motion was, simply, whether the guilt-phase jury should be discharged. There was no mistrial actually involved since there was nothing that could have been the subject of a retrial. That is to say, the guilt phase had been completed and that verdict would stand in any event, and the

penalty phase, not yet begun, could, without invoking mistrial/double jeopardy considerations, have been conducted by a different jury as a matter of specific statutory authorization. Thus, as we view it, the mistrial order was, in actuality, nothing more than a determination by the court that the guilt-phase jury should be discharged.

The real question then was only whether, in the extraordinary circumstances of this case, a penalty phase with a new jury should ensue. Again, we do not view this issue as one involving double-jeopardy concerns. Defendant had not been previously placed in jeopardy *vis-a-vis* the penalty phase, and the statute expressly authorizes a different jury for that proceeding. The issue rather, as Judge Turnbach expressly characterized it, is one of fundamental fairness.

▇▇▇▇ We appreciate that the principle of fundamental fairness, standing alone as a *ratio decidendi*, is an amorphous doctrine. We need not, however, explore its parameters because this is such a clear case. In the context of prosecutorial misconduct, the doctrine of fundamental fairness prohibits the State from taking advantage of unlawful or unconscionable acts by the Prosecutor that prejudice the defendant's right to a fair trial. As explained by *State v. Sugar*, 84 *N.J.* 1, 15, 417 *A.*2d 474 (1980), the doctrine "is directed at both judicial integrity and the actions of ... [law enforcement] officials which may impugn that integrity." Where the wrongful and unconscionable conduct of a public official has offended the rights both of an individual defendant and of the criminal justice system generally, the principle of fundamental fairness thus demands an appropriate remedy adequate to vindicate the resultant perversion of the judicial process as well as defendant's resultant prejudice. Such a remedy must be fashioned because toleration of such conduct "would erode public confidence in the impartiality and fairness of the judicial process." *Ibid.* Thus, unless the integrity of the criminal trial can be protected by alternative measures and lesser sanctions, grievous and offending prosecutorial misconduct may require dismissal of

the prosecution. *Ibid. See also State v. Peterkin,* 226 *N.J.Super.* 25, 38–39, 543 *A.*2d 466 (App.Div.), *certif. denied,* 114 *N.J.* 295, 554 *A.*2d 850 (1988).

■ Here, of course, there is no question of dismissal of the indictment or of impugning the verdict by which defendant has been found guilty of two counts of first-degree murder. The issue is not whether the prosecution for the crime may proceed but only whether the penalty phase may proceed. Put another way, the proper inquiry is whether, in the circumstances, there is any available alternative other than preclusion of the penalty-phase proceeding for curing and vindicating this prosecutorial transgression upon public and individual rights. We agree with the trial judge's perception that there is not. We are in full accord with Judge Turnbach's conclusion, for the reasons stated by him, that defendant, in these circumstances, will be substantially and irremediably prejudiced by proceeding on the penalty phase with a new jury. We are in full accord with the judge's conclusion that irrespective of any evil intent, the Prosecutor's conduct that placed defendant in his present predicament constituted an egregious, intentional and intolerable breach of the inviolability of the secrecy of jury deliberations. And we are in full accord with the judge's conclusion that the doctrine of fundamental fairness demands the remedy of preclusion. There is no effective alternative measure or lesser sanction available here. We appreciate that there is a countervailing interest of the public that criminal prosecutions not be thwarted and that wrongdoers be brought to account. We are satisfied, however, that that interest has been fully satisfied here by the unaffected return of the first-degree murder verdicts.

We add one final observation. It is, of course, within the sole discretion of the Prosecutor to seek the death penalty. Deliberate prosecutorial misconduct tainting the integrity of the penalty phase proceeding and prejudicing a capital defendant's right to a fair penalty proceeding may be simply viewed as a waiver by the Prosecutor of his right to exercise that discretion. The Prosecu-

tor may not have intended to waive the death penalty. But that is the necessary consequence of his misconduct.

The order appealed from is affirmed.