761 A.2d 523

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JEFFREY ZHU, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. XIN DAN LIN, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. YUN LIN, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHAO LIN FENG, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHO LEE LIN, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SIMON LAU, DEFENDANT–APPELLANT.

Argued September 12, 2000—Decided October 23, 2000.

*Stephen W. Kirsch,* Assistant Deputy Public Defender, Counsel for appellant Xin Dan Lin and *George W. Eckhardt,* Designated Counsel, for appellant Jeffrey Zhu argued the cause for appellants (*Ivelisse Torres,* Public Defender, attorney; *Mr. Kirsch, Mr. Eckhardt* and *Brian P. O'Reilly,* Designated Counsel, for Xin Dan Lin, on the briefs).

*John J. Scaliti,* Assistant Prosecutor, argued the cause for respondent (*William H. Schmidt,* Bergen County Prosecutor, attorney).

*Michael C. Kazer,* Designated Counsel, submitted briefs on behalf of appellant Yun Lin (*Ivelisse Torres,* Public Defender, attorney).

*James F. Anderson,* Designated Counsel, submitted letter briefs on behalf of appellant Chao Lin Feng (*Ivelisse Torres,* Public Defender, attorney).

*Charles B. Andre,* Designated Counsel, submitted briefs on behalf of appellant Cho Lee Lin (*Ivelisse Torres,* Public Defender, attorney).

*Mark E. Tabakman,* Designated Counsel, submitted a letter brief on behalf of appellant Simon Lau (*Ivelisse Torres,* Public Defender, attorney).

*Jeffrey Zhu* submitted a supplemental brief *pro se.*

The opinion of the Court was delivered by

VERNIERO, J.

Defendants were tried and convicted on murder and other charges stemming from a gang-related multiple homicide in Teaneck, New Jersey. At the trial that spanned several months, the

County Sheriff implemented a plan of heightened security consisting of an increased presence of uniformed officers in the courtroom as well as other measures. We must determine whether the elevated security deprived defendants of their right to a fair trial by creating an unacceptable atmosphere suggestive of guilt. The Appellate Division concluded that defendants were not denied a fair trial. We agree and, therefore, affirm.

I.

Defendants are members of a Chinese gang known as Fuk Ching. The gang's activities included extortion, arson, and loan sharking. At the time of the murders the gang derived profits from smuggling illegal Chinese aliens into the United States. The immigrants purportedly paid between $20,000 and $30,000 for transportation and were required to pay back approximately $1,000 a month to the gang. Many, if not most, of the immigrants took low-paying jobs and were forced to live as cheaply as possible, often in gang-run "safe houses." If the immigrants did not repay the debt, they were held captive and sometimes beaten. Some aliens became involved in the gang's criminal activities.

In furtherance of the gang's operations, a ship carrying hundreds of illegal Chinese immigrants was due to arrive off the coast of Massachusetts in 1993. Rival members within the Fuk Ching gang decided that they would kill the gang's leader and other high-ranking members and thereby take control of those expected immigrants. On May 24, 1993, the rivals attempted to carry out their plan by attacking a safe house in Teaneck, New Jersey. There were four gang members and one smuggled alien living in the house, and defendants shot or stabbed all of the occupants (one occupant was actually shot outdoors as he attempted to escape harm). Four of the victims of the attack died; one victim, the alien, survived.

Having received descriptions of the getaway van seen by witnesses, the police arrested all defendants (except defendant Lau) a short time after the shooting at a roadblock near the George

Washington Bridge. The police retrieved numerous weapons from defendants and the safe house, including guns, knives, handcuffs, a container of gasoline, and ammunition. The police also found blood-stained clothing in the van. Defendant Lau, who had fled the murder scene in a separate vehicle, was arrested sometime later in Florida and extradited to New Jersey. Defendants were indicted on numerous counts of murder, attempted murder, felony murder, kidnapping, burglary, attempted arson, and various weapons offenses.

Against the background of the indictment and the gang's alleged internecine rivalries, the Bergen County Sheriff's Office proposed certain high-security procedures to be implemented at trial. Frank Benedetto, a captain with that office, outlined the procedures in a May 8, 1995, memorandum to the Sheriff. The memorandum states in full:

> The Bergen County Sheriff's Department's standard operating procedure for high security trials will be implemented in reference to the State of New Jersey vs. [Jeffrey Zhu, et al.] trial.
>
> A supervising officer will be assigned to oversee the security detail. An appropriate amount of officers will be assigned to address all participants, the judge, the jury, defendants, defense attorneys, the prosecutor and the general public.
>
> Please be advised that five defendants are presently incarcerated in the Bergen County Jail and one is incarcerated in the Hudson County Jail.
>
> The said defendants will be transported on a daily basis by members of the Transportation Unit. Once inside the Justice Complex they will be escorted from holding areas through the corridors utilizing handcuffs and leg irons. All corridors will be cleared prior to the movement and all jurors will be secured in the jury room prior to any movement. Special precautions will be taken to assure that no juror will see the said defendants in escort. Once inside the courtroom, handcuffs and leg irons will be removed.
>
> The courtroom in question will be searched on a daily basis prior to its opening, [and] it will be closed and locked during lunch. All participants, including the general public will have to pass through mangetometer-type [sic] searches. All packages and briefcases will have to be opened for examination.
>
> No police officer and or members of the Prosecutor's office will be permitted to carry firearms into the courtroom in question. The Sheriff's officers assigned to the handling of the defendants will also be unarmed.
>
> Also be advised that all Sheriff's personnel will be briefed on a daily basis prior to their assignments by the supervising officer as to their responsibilities and duties. At the close of each day, the supervising officer will conduct an additional meeting critiquing that days [sic] activities.

On May 22, 1995, the trial court conducted a hearing during which defense counsel questioned Captain Benedetto regarding the proposed plan. As reflected in the transcript of that proceeding, Captain Benedetto explained that in addition to passing through metal detectors located at the main entrances to the courthouse, all individuals entering the courtroom would be cleared each day by security personnel employing magnetometers (handheld metal detectors that resemble wands). Specifically, a Sheriff's officer would wave the magnetometer close to the individual before that individual entered the courtroom. Captain Benedetto estimated that the procedure would take only a few seconds. Additionally, Sheriff's officers positioned outside the courtroom would visually inspect any handbags, packages, or briefcases belonging to any person seeking entry. Security personnel employing those procedures would clear all persons entering the courtroom, including jurors, counsel, judicial staff, spectators, and the judge himself.

Captain Benedetto explained that the heightened security plan was necessary because: first, the Sheriff's Office believed that an organized criminal group had threatened the lives of one or more defendants; second, there was a possibility that a family member of the judge, his staff, or the jurors might be held hostage and a family member of that hostage would be compelled to smuggle a weapon into the courtroom in exchange for the hostage's safety; and third, it might be possible for someone to bypass the security checkpoints at the two main entrances because of the large number of other entrances to the courthouse.

Captain Benedetto also described briefly his training and experience as a graduate of the Federal Law Enforcement Training Center in Glenco, Georgia, where members of the United States Secret Service and United States Marshals conduct courses on courthouse security. The captain stated that "that's what they teach you for high-risk trials, that all participants, including the judge, should be searched." He also noted that in drawing up the plan he consulted with one of his superiors, an undersheriff, in

addition to a lieutenant and one of the sergeants in the Sheriff's Office. The captain then presented the plan to the Sheriff in the May 8, 1995, memorandum noted above. The Sheriff in turn instructed the captain to present the plan to the court.

At the conclusion of the hearing, the trial court announced its intention to enter an order essentially codifying the proposed procedures. The court recited its own experience in dealing with security issues, stating: "I had at least a civil case involving someone in the Witness Protection Program, basically what's outlined here, I was informed by the Federal Marshals, we then moved to [another] courtroom, and all people coming in and out went through the magnetometer search, went up to the courtroom, the jurors went through it every day, they did a search of the courtroom, chambers, everything else before the trial started. I don't consider it unusual, in certain situations it exists."

On May 30, 1995, the trial court entered an order formally adopting the security plan:

It is ... ordered that the Bergen County Sheriff's Department's standard operating procedure for high security trials will be implemented in reference to the above captioned matter.

A supervising officer will be assigned to oversee the security detail. An appropriate amount of officers will be assigned to address all participants, [the judge], the jury, defendants, defense attorneys, the prosecutor and the general public. [The judge], the jury, defendants, defense attorneys, and the prosecutor will enter the courtroom via a second entrance; separate from the entrance to be used by the general public. All participants, including the general public will have to pass through mangetometer-type [sic] searches. All packages will be opened for examination.

The defendants will be transported on a daily basis by members of the Bergen County Sheriff's Office's Transportation Unit. Once inside the Justice Complex defendants will be escorted from holding areas through the corridors utilizing handcuffs and leg irons. All corridors will be cleared prior to the movement of defendants. Further, all jurors will be secured in the jury room prior to the movement of defendants. Special precautions will be taken to assure that no juror will see the defendants during escort. Once inside the courtroom, defendants' handcuffs and leg irons will be removed.

[The judge's] courtroom will be searched on a daily basis prior to its opening. The courtroom will be closed and locked during lunch.

No police officer and/or members of the Prosecutor's Office will be permitted to carry firearms into the courtroom. The Sheriff's officers assigned to the handling of the defendants will also be unarmed.

In its cover letter to all counsel enclosing that order, the court noted that any party objecting to the provisions of the order could petition the Appellate Division for review. Two defendants sought leave to appeal from the order regarding the heightened security measures. The Appellate Division denied that request.

The trial began on September 11, 1995, and ended on December 15, 1995. There were eight days of jury selection and forty-one days of actual trial. As part of *voir dire*, every juror was asked the following question:

The Bergen County Sheriff's Office has determined that increased security measures are necessary for this trial. Searches will be conducted of all persons, including jurors, before each person enters the courtroom. Do you understand that the security measures have nothing to do with the guilt or innocence of each defendant and should not affect your verdict in any way?

No cautionary instruction was given to the jury during the trial or before deliberations, and none was requested by defendants.

The Sheriff's Office implemented the security plan essentially as described in the court's order. There is a slight disagreement in the record concerning the exact number of Sheriff's officers present in the courtroom. The State claims in its Appellate Division brief that approximately twelve officers were in the courtroom; in its brief before this Court, the State maintains "that a complement of 10 officers were generally deployed in the courtroom during the trial." Defendants variously claim that there were between sixteen and twenty officers present on any given day. For our purposes we will assume that the number of uniformed officers fluctuated between eighteen (the average of defendants' claims) and eleven (the average of the State's claims), depending on the day. The record is clear that one officer stood directly behind each defendant throughout the trial.

The State presented testimony from residents who heard the gunfire and saw defendants' blue van parked in the street, and who later saw defendants drive away. Several police officers and

ambulance volunteers testified about what they observed at the scene. The police officers also testified about the evidence they collected at the house and in the van at the George Washington Bridge. Forensic scientists testified that the blood on some of defendants' clothes matched some of the victims' blood types. A sergeant from the New Jersey State Police Ballistics Unit testified that bullets removed from the victims were fired from the guns retrieved by the police.

The survivor of the attack also testified. He explained to the jury that he entered the United States illegally and thus owed the gang about $30,000. He was in the house when defendants entered. He stated that he was handcuffed and gagged by defendants, dragged into the basement, and then shot.

The jury convicted defendants on four counts of murder, two counts of attempted murder, five counts of felony murder, two counts of kidnapping, one count of burglary, one count of attempted arson, and various weapons offenses. Each defendant (except defendant Zhu) received an aggregate sentence of four life terms plus forty years, with 140 years of parole ineligibility. Defendant Zhu received an aggregate sentence of four life terms with 120 years of parole ineligibility.

Defendants appealed to the Appellate Division, which affirmed their convictions and sentences in an unreported decision. (For completeness, we note that the panel determined that the trial court should have merged certain counts before sentencing and directed that the judgment of conviction be amended accordingly.) Defendants contended that the courtroom security plan was so overbearing that it infringed on their presumed innocence, thereby denying them a fair trial. The Appellate Division rejected that contention, "[t]hough not without some concern." The Appellate Division also addressed other contentions of defendants not pertinent to this appeal. We granted defendants' petition for certification, 163 *N.J.* 78, 747 *A.*2d 286 (2000), solely to address the security question.

## II.

The right to a fair trial before an impartial jury is imbedded in the criminal law by virtue of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. *U.S. Const.* amend. V, VI, and XIV; *N.J. Const.* art. I, ¶ 10. As a corollary to that right, "one accused of a crime is entitled to have his [or her] guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky,* 436 *U.S.* 478, 485, 98 *S.Ct.* 1930, 1934, 56 *L.Ed.*2d 468, 475 (1978). Thus, trial courts have a duty to scrutinize closely those practices that pose a threat to fairness and do not serve an essential state purpose. *See, e.g., Estelle v. Williams,* 425 *U.S.* 501, 505, 96 *S.Ct.* 1691, 1693, 48 *L.Ed.*2d 126, 131 (1976) (compelling defendant to wear prison clothes in front of jury violates Fourteenth Amendment because it may negatively affect judgment of jurors); *State v. Roberts,* 86 *N.J.Super.* 159, 163, 206 *A.*2d 200 (App.Div.1965) (recognizing that physical restraints may be used only in exceptional circumstances because of inherent prejudice they impart to jury).

The United States Supreme Court has held that the deployment of security personnel in a courtroom is not inherently prejudicial. *Holbrook v. Flynn,* 475 *U.S.* 560, 106 *S.Ct.* 1340, 89 *L.Ed.*2d 525 (1986). In *Holbrook,* four uniformed state troopers sat in the front row of the spectators' section of the courtroom to supplement the customary security force (six defendants were on trial in *Holbrook;* only one defendant appealed). *Id.* at 562, 106 *S.Ct.* at 1342, 89 *L.Ed.*2d at 530. The jurors' responses to *voir dire* indicated that the presence of the four troopers would not affect the defendants' ability to receive a fair trial. *Id.* at 565, 106 *S.Ct.* at 1344, 89 *L.Ed.*2d at 532. The Supreme Court upheld the defendant's conviction, concluding that "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that,

like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568–69, 106 *S.Ct.* at 1345–46, 89 *L.Ed.*2d at 534. Writing for the Court, Justice Marshall articulated the appropriate inquiry whenever a courtroom arrangement is challenged as inherently prejudicial: "[W]hether 'an unacceptable risk is presented of impermissible factors coming into play[.]' " *Id.* at 570, 106 *S.Ct.* at 1346–47, 89 *L.Ed.*2d at 535 (citation omitted).

Defendants argue that the *Holbrook* standard has been satisfied here, namely, that the heightened security plan posed an unacceptable risk that impermissible factors prejudiced the jury. Defendants further contend that the trial court abdicated its responsibility by surrendering control of the courtroom to the Sheriff. Additionally, defendants assert that numerous confrontations between Sheriff's officers and defense counsel contributed to an unacceptable trial atmosphere and impermissibly infringed on their right to counsel. The State counters by asserting that the trial court's decision permitting the enhanced security plan constituted an exercise of sound discretion and did not deny defendants a fair trial.

We conclude that the security plan did not pose an unacceptable risk of unfairness. *Holbrook, supra,* 475 *U.S.* at 570, 106 *S.Ct.* at 1346–47, 89 *L.Ed.*2d at 535. Our reasons are similar to those noted by the Appellate Division:

First, at no time was a finding made, or an accusation brought, that extra security measures were needed because of the conduct, character, or prior record of the defendants. Nothing was presented to the jury that would have led to this conclusion. That is, the extra security was needed purportedly to protect defendants, and everyone else involved in the trial, from threats from outside parties— not to protect anyone from the defendants. Nothing ever occurred during trial that would have caused the jury to conclude otherwise. Second, all prospective jurors were asked in their questionnaires whether they understood that increased security measures, including the search of all persons entering the courtroom, had nothing to do with the guilt or innocence of defendants. Third, the patent, and unacceptable, hostility displayed towards the defense attorneys was, for the most part, out of the presence of the jury, and not in the courtroom itself.

Courts in other jurisdictions have found similarly that the presence of additional security personnel in a courtroom, alone or

in combination with other security measures, is not prejudicial. *See, e.g., Carrasquillo v. State,* 742 *S.W.*2d 104, 112 (Tex.Ct.App. 1987) (finding no prejudice absent showing that presence of four officers caused any confusion or distracted attention of jurors); *Dorman v. United States,* 435 *F.*2d 385, 398 (D.C.Cir.1970) (concluding that Deputy United States Marshal standing behind each defendant at counsel table was not prejudicial); *People v. Jenkins,* 22 *Cal.*4th 900, 95 *Cal.Rptr.*2d 377, 997 *P.*2d 1044, 1110 (2000) (finding use of metal detector outside courtroom in addition to enhanced number of security officers within courtroom was not inherently prejudicial).

Common experience informs us that citizens have become accustomed to the presence of security personnel in most public places, including schools. Members of the public pass through metal detectors and have their bags inspected at airports, courthouses, and elsewhere as part of the everyday precautions now tolerated in a free society. Such common practices help prevent jurors from drawing any undue inferences at the sight of similar security measures in a courthouse setting. *See Holbrook, supra,* 475 *U.S.* at 569, 106 *S.Ct.* at 1346, 89 *L.Ed.*2d at 535 (observing, "[i]ndeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards"). We are thus satisfied that implementation of the security plan in this case was not inherently suggestive of defendants' guilt and that the presumption of innocence was not lost.

Nor do we conclude that the trial court impermissibly delegated its responsibilities to the Sheriff. The record indicates clearly that the security plan emanated from the Sheriff's Office. However, that the trial court adopted the plan as set forth in the court's May 30, 1995, order is equally clear. Although additional questioning of Captain Benedetto on the need for the more intrusive aspects of the plan would have been preferable, we will not substitute our judgment for the judgment of those closest to the trial when it appears that they have acted reasonably under the circumstances. Because the crimes alleged in the indictment were

the product of a violent, intra-gang rivalry capable of reaching into the courtroom, we cannot fault the trial court for accepting Captain Benedetto's testimony, even though additional findings to enhance that testimony might have strengthened the basis for the court's action.

Accordingly, we hold that the heightened security measures in this case did not deprive defendants of a fair trial before an impartial jury. Even if we assume some slight error on the part of the trial court in the manner in which the security plan was adopted and implemented, or by the court's failure to deliver an unsolicited cautionary charge to reinforce the *voir dire*, such error was not clearly capable of contributing to the verdict in view of the overwhelming evidence of defendants' guilt. *State v. Loftin*, 146 *N.J.* 295, 397, 680 *A.*2d 677 (1996).

### III.

Our holding is not to be understood as an endorsement of those elements of the trial that seemingly fueled a contentious and sometimes bitter relationship between Sheriff's officers and defense counsel. Counsel asserted before the trial court that security personnel subjected them to overzealous searches (for example, Sheriff's officers allegedly read the contents of file folders), and were openly hostile toward defendants and their attorneys. The trial court assumed that the officers were acting appropriately but nonetheless directed them to refrain from reading the contents of folders or briefcases absent a valid security purpose. As noted by the Appellate Division, the officers' purported conduct could not have influenced the verdict because the jury was, for the most part, unaware of it.

Similarly, counsel's allegations that Sheriff's officers visited physical indignities on defendants at the County jail when court was not in session, although not resolved by the trial court, are troubling. Because those allegations focus on events that allegedly occurred outside the presence of the jury, and are not before us for review, we do not address them. We hasten to add, however,

that such events involving security personnel, if they occurred as alleged, would have been patently unacceptable.

■ We also take this occasion to comment generally on the responsibilities of a trial court in selecting appropriate measures for high-security trials. By statute, the County Sheriff "shall provide for security for the Law and Chancery Divisions of the Superior Court sitting in that county in the manner established by the assignment judge in the county." *N.J.S.A.* 2B:6–1d. Thus, although the Sheriff is the presumed expert in these matters and has primary responsibility to provide for security, it is the non-delegable duty of a trial court ultimately to approve such measures consistent with constitutional protections to which all defendants are entitled. As noted in a prior opinion of this Court:

> [W]e emphasize that a trial court's paramount responsibility in presiding over a criminal trial is to assure that the proceedings are conducted fairly and that a verdict is rendered impartially by the jury. To that end, a court has broad discretionary powers that may be exercised to protect the jury from extraneous pressures that might affect the proper discharge of its sworn duty. In appropriate circumstances, that power might properly be exercised by imposing limitations on the dress of police or correction officers, by prohibiting the display of buttons or emblems, or by other proscriptions necessary to preserve decorum and an atmosphere of impartiality in the courtroom.
>
> [*State v. Rose,* 112 *N.J.* 454, 541–42, 548 *A.*2d 1058 (1988).]

■ Moreover, consistent with its responsibilities, "[a] trial judge is given wide discretion in determining proper security measures within the courtroom and is obliged to act to protect the jury, [defendants,] counsel, witnesses, and members of the public." *State v. Cook,* 330 *N.J.Super.* 395, 415, 750 *A.*2d 91 (App.Div.), *certif. denied,* 165 *N.J.* 486, 758 *A.*2d 646 (2000). To assist in effective appellate review, trial courts must create an appropriate record containing the reasons for enhanced security and the basis for the court's adoption of any such plan.

■ Lastly, we do not suggest that a trial record must contain compelling evidence to justify the need for adequate security. "Security measures that are not inherently prejudicial need not be justified by compelling evidence of imminent threats to the security of the court." *People v. Jenkins, supra,* 95 *Cal.Rptr.*2d 377, 997

*P.*2d at 1111 (citing *Holbrook, supra,* 475 *U.S.* at 568–69, 106 *S.Ct.* at 1345–46, 89 *L.Ed.*2d at 534). Stated differently, a certain level of security is presumed necessary in today's society. We stress, however, that a trial court cannot allow unsupported or unreasonable assumptions concerning the need for security to dictate implementation of enhanced measures. Rather, trial courts must ensure that the security measures they employ do not brand the accused with the indicia of guilt contrary to constitutional guarantees. For the reasons already noted, those guarantees were not breached in this case.

### IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.