763 A.2d 1254

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANGEL MAISONET, DEFENDANT–APPELLANT.

Argued November 28, 2000—Decided January 17, 2001.

10

*Alan I. Smith*, Designated Counsel, argued the cause for appellant (*Joel M. Harris*, First Assistant Public Defender, attorney).

*Joseph H. Enos, Jr.*, Assistant Prosecutor, argued the cause for respondent (*Andrew N. Yurick*, Gloucester County Prosecutor, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

In this criminal appeal, we must determine whether defendant's treatment at the Gloucester County Jail warrants reversal of his conviction. While in custody at the jail, defendant was denied basic necessities such as food, soap, water, a clean mattress and blanket, and a comb. After testifying before the jury in a visibly disheveled state, defendant was convicted of certain drug offenses and sentenced to sixteen years in prison with six years and four months of parole ineligibility. The Appellate Division upheld the conviction and sentence. We now reverse and hold that defendant is entitled to a new trial.

I.

The facts may be briefly stated. Defendant Angel Maisonet and co-defendant, Adolfo Marquez, were arrested for drug-related offenses following a motor vehicle stop, the details of which are not before us for review. Defendant and co-defendant were present in defendant's vehicle at the time the drugs were seized. In a single indictment, the Gloucester County Grand Jury charged both men with possession of cocaine pursuant to *N.J.S.A.* 2C:35–10a(1) and possession of cocaine with the intent to distribute pursuant to *N.J.S.A.* 2C:35–5a(1) and 35–5b(2).

Defendant and Marquez were tried together at a trial that lasted one week. During the course of the trial, defendant was

housed in the Gloucester County Jail; Marquez was free on bail. On at least three days of the trial, defendant appeared dirty and unkempt. In contrast, the record indicates nothing untoward about Marquez's appearance. Each man testified, essentially accusing the other of owning the drugs in question. Credibility was thus a critical issue for the jury to resolve.

On the first day of the trial, the trial court expressed its concern over the disheveled appearance of defendant:

> The court: I have to ask a wild and crazy question, folks. Directed to the sheriffs. Do they sell combs in the jail?
>
> Sheriff's officer: They don't sell combs. They have a care package, which is a bar of soap, a comb, and something else. And there is a price to it, but I'm not sure what it is.
>
> The court: Well, I want it worked out ... before tomorrow morning so [defendant] doesn't have the difficulty of coming to court without his hair combed.
>
> . . . .
>
> Defendant: I don't have nothing out there.
>
> Co-defendant's counsel: When they come in from State Prison they don't have anything.
>
> Defendant: We don't have running water in the cell they got me.
>
> The court [to defendant's counsel]: [Y]ou may want to have a discussion with the Sheriff's Officer. A bar of soap, a combing, I think ... that should be taken care of. And I want to make it very clear to the sheriffs through the Sheriff's Office, if [defendant] is entitled to basic amenities, I expect that that will be accomplished. Just sending a message. That's just a matter of humanity and fairness and dignity. Everyone is entitled to their integrity and fairness.

The proceedings for that day took place despite defendant's appearance.

By the afternoon of the second day, the situation had not improved. Defendant's counsel informed the trial court after the lunch break that the Sheriff's officers had not provided defendant with any food for lunch. The trial court then ordered one of the officers to deliver food to defendant.

Still without a shower, defendant testified before the jury on the third day. Immediately following that testimony, defendant's counsel informed the court outside of the jury's presence:

> Perhaps this would be an appropriate time to place everything on the record. Judge, I had indicated to the court in chambers that [defendant] is a state prisoner,

and he's been given really no—nothing from this county jail .... [A]s we stand here today, Judge, [defendant] is on his fourth day without a shower. He has yet to have been provided soap, he has yet to have been provided toothpaste. He wasn't provided a meal—lunch, yesterday ... he's advised that he's been sleeping with a blanket that has—is covered with ants.

Judge, in an effort to try to resolve this situation, I went to the store yesterday, out of my pocket, purchased [defendant] soap and toothpaste. I brought it up here to the jail ... [and] I was advised by the sheriff in charge there that absolutely under no circumstances was I permitted to give [them to defendant] or leave [them] for [defendant].

[Defendant's] here Judge ... [h]e hasn't showered. And what's most concern-ing, Judge, is that we have a jury of fourteen people sitting here. We have jurors' seats ... five or six feet away from where [defendant] was just on the stand. No offense to [defendant], but anyone that goes four days without a shower doesn't have the best body odor.

And it's a concern because the jurors are looking at these people. Credibility could not be any more important in this case. The jury is looking at him and saying, not only looking at him but smelling him, and it's going to weigh on the jury and it could severely prejudice [defendant].

In response, the trial court directed the Sheriff's officers to arrange for a representative to appear before the court to explain defendant's treatment. A lieutenant from the Sheriff's Office appeared later that day, confirming that defendant's complaints were accurate. The officer attributed the lack of soap to a "miscommunication." He explained that the toothpaste and other supplies were "on order." When asked by the trial court whether defendant was provided with a clean blanket, the officer claimed that there were shortages at the jail, stating: "If he got a blanket, he's lucky he has one, sir." The Sheriff's officer assured the court that defendant would be provided soap, toothpaste, and a shower.

Although the trial court was troubled by the actions of the Sheriff's Office, the court nonetheless concluded that defendant's physical appearance did not adversely sway the jury. The court stated:

Now, lookwise, [defendant] doesn't look like he's out of kilter. I have to indicate to you that I'm two feet away, three feet away, four, five, six feet away, and fortunately in this case, I don't smell anything ... untoward. Now, it doesn't make it right. The answer is no, it doesn't make it right.

Following closing arguments, the trial court charged the jury. The instructions on evaluating credibility included this language:

"As the judges of the facts, you are to determine the credibility of each and every witness, and in determining whether a witness is worthy of belief, and therefore, credible, you may take into consideration ... the appearance and demeanor of the witness[.]" The jury found defendant guilty of third-degree possession of cocaine and second-degree possession of cocaine with intent to distribute. Marquez was found guilty of the third-degree possession charge but acquitted of the more serious second-degree distribution offense. Before sentencing, the trial court denied defendant's motion for a new trial.

Defendant appealed to the Appellate Division, which affirmed his conviction and sentence in an unreported decision. The court concluded that the failure of the Sheriff's Office to furnish defendant with basic amenities did not deprive him of a fair trial. As support, the panel noted that the trial court, after observing defendant, did not believe his appearance had a negative effect on the jury. The panel also noted that defendant failed to request that the trial court deliver a cautionary charge to the jury concerning his appearance.

The Appellate Division also addressed other contentions of defendant not pertinent to this appeal. We granted defendant's petition for certification, 165 *N.J.* 498, 759 *A.*2d 347 (2000), to address whether defendant's disheveled appearance impermissibly affected the jury's verdict, thereby requiring a new trial. We must also determine whether the denial of basic amenities itself violated principles of fundamental fairness, warranting our intervention.

## II.

### A.

The right to a fair trial is fundamental. *Estelle v. Williams*, 425 *U.S.* 501, 96 *S.Ct.* 1691, 48 *L.Ed.*2d 126 (1976). We recently summarized the contours of that principle:

> The right to a fair trial before an impartial jury is imbedded in the criminal law by virtue of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. *U.S. Const.* amend. V, VI, and XIV; *N.J. Const.* art. I, ¶ 10. As a corollary to that right, "one accused of a crime is entitled to have his [or her] guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 *U.S.* 478, 485, 98 *S.Ct.* 1930, 1934, 56 *L.Ed.*2d 468, 475 (1978). Thus, trial courts have a duty to scrutinize closely those practices that pose a threat to fairness and do not serve an essential state purpose.
>
> [*State v. Zhu*, 165 *N.J.* 544, 553, 761 *A.*2d 523 (2000) (citations omitted).]

Courts have long recognized that a defendant's outward appearance can threaten the fairness of proceedings. Decisions addressing the effect of compelling a defendant to wear prison attire or to be shackled at trial are particularly instructive. The seminal case pertaining to prison attire is *Estelle, supra,* 425 *U.S.* 501, 96 *S.Ct.* 1691, 48 *L.Ed.*2d 126. In that case, the defendant appeared at trial in prison attire after his request for civilian clothes was denied. Neither the defendant nor his counsel objected to the denial of his request. *Id.* at 502, 96 *S.Ct.* at 1692, 48 *L.Ed.*2d at 129–30.

The United States Supreme Court concluded that the State could not, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes. The Court reasoned that to force a defendant to appear in that fashion would impair the presumption of innocence while furthering no vital State interest. *Id.* at 505, 96 *S.Ct.* at 1693, 48 *L.Ed.*2d at 131. Such a practice would disproportionately prejudice those who could not post bail prior to trial. *Id.* at 505, 96 *S.Ct.* at 1694, 48 *L.Ed.*2d at 131. Thus, the Court concluded, "[t]o impose the condition on one category of defendants, over objection, would be repugnant to the concept of equal justice embodied in the Fourteenth Amendment." *Id.* at 505–06, 96 *S.Ct.* at 1694, 48 *L.Ed.*2d at 131.

The Court ultimately held that the defendant's failure to object to his condition "negat[ed] the presence of compulsion necessary to establish a constitutional violation." *Id.* at 513, 96 *S.Ct.* at 1697,

48 *L.Ed.*2d at 135. Although the Court in *Estelle* did not overturn the defendant's conviction, that case stands firmly for the proposition that fair-trial guarantees are violated when an accused is forced to appear at trial wearing prison clothes. *See also People v. Hetrick*, 125 *Cal.App.*3d 849, 178 *Cal.Rptr.* 303, 306 (1981) (finding no waiver despite lack of formal objection because defense counsel made court aware of defendant's desire to be tried in civilian clothing rather than prison attire).

New Jersey has been especially vigilant in protecting a defendant's right not to be compelled to appear at trial in prison attire and, in so doing, has built on the standards established in *Estelle*. In *State v. Carrion–Collazo*, 221 *N.J.Super.* 103, 534 *A.*2d 21 (App.Div.1987), *certif. denied*, 110 *N.J.* 171, 540 *A.*2d 171 (1988), the Appellate Division expressed concern about the prejudice that may arise when a defendant is compelled to appear at trial clothed inappropriately. In discussing *Estelle*, the court established protective procedures to be followed in all subsequent cases:

> [E]ven in the absence of a constitutional requirement, future criminal defendants appearing for a jury trial in prison garb should be personally questioned by the trial judge concerning their desire to relinquish the right to appear in civilian clothing and that ... right should be given up only by means of a knowing, intelligent and voluntary waiver on the record before the trial judge.
>
> *[Id.* at 112, 534 *A.*2d 21.]

The court also noted that the proper *voir dire* of the jury, coupled with a cautionary instruction, could guard against potential prejudice. The court instructed that "when a request for civilian clothing or a precautionary *voir dire* or jury charge is made by a defendant or his counsel such request may not be denied." *Id.* at 113, 534 *A.*2d 21; *accord State v. Gertrude*, 309 *N.J.Super.* 354, 357, 707 *A.*2d 178 (App.Div.1998) (reversing conviction of defendant who appeared at trial in prison clothes because protective procedures articulated in *Carrion–Collazo* were not followed by trial court). See also *State v. Roberts*, 86 *N.J.Super.* 159, 163, 206 *A.*2d 200 (App.Div.1965) (recognizing that physical restraints may be used on defendant only in exceptional

circumstances because of inherent prejudice that they impart to jury).

Courts in other jurisdictions have recognized the importance of having a defendant appear at trial in an acceptable physical condition. In *Hicks v. State*, 256 *Ga.* 715, 352 *S.E.*2d 762, 769, *cert. denied*, 482 *U.S.* 931, 107 *S.Ct.* 3220, 96 *L.Ed.*2d 706 (1987), the Supreme Court of Georgia observed that a defendant has a right to a "suitable courtroom appearance." In the same vein, in *State v. Spellman*, 562 *So.*2d 455, 456 (La.1990), the Supreme Court of Louisiana reversed the conviction of a defendant who appeared at trial in prison clothing in part because the trial court had failed to find that the defendant's attire was "reasonably clean and suitable." The court said that, "[a] defendant may insist he appear before jurors with all the dignity of a free man, presumed innocent until determined otherwise[.]" *Ibid.*

Here, the record demonstrates that defendant was denied basic necessities while in custody. As a direct result of that treatment, defendant appeared dirty and unkempt during most of the trial. Defendant's condition was noticed by the trial court on the first day of trial, so presumably the jury was aware of it as well. In that regard, we find this case to be similar to the prison-attire cases. Through no fault of his own and despite his counsel's objections, defendant was compelled to appear at trial in a disheveled state that undoubtedly had the potential to diminish his credibility before the jury. The harm to defendant was compounded by the fact that his defense consisted mainly of his own testimony, requiring the jury to assess his truthfulness as compared to that of his co-defendant.

We are satisfied that because defendant's credibility was a central issue for the jury to determine, his dirty and disheveled appearance created an unacceptable risk that the jury's verdict would be tainted. At the root of the inquiry concerning defendant's physical appearance is "not whether jurors actually articulated a consciousness of some prejudicial effect, but whether 'an unacceptable risk is presented of impermissible factors coming

into play[.]'" *Holbrook v. Flynn*, 475 *U.S.* 560, 570, 106 *S.Ct.* 1340, 1346–47, 89 *L.Ed.*2d 525, 535 (1986) (citation omitted). Thus, the fact that the trial court may have failed to "smell anything" does not dispose of the issue. That defendant's overall appearance, caused by factors beyond his control, may have unduly impugned his credibility in the eyes of jurors is sufficient to establish a constitutional violation.

█ The State argues that defendant waived his right to complain about those issues on appeal because he failed to request a curative instruction either at the conclusion of the trial or during *voir dire*. We disagree. Although defendant did not request a cautionary charge, his counsel did object to his treatment and articulated before the trial court precisely how that treatment would prejudice his defense. Moreover, because the court's instruction to the jurors invited them to consider the physical appearance of defendant when assessing his credibility, we are convinced that the circumstances endured by defendant were clearly capable of producing an unjust result. *State v. Delibero*, 149 *N.J.* 90, 106–07, 692 *A.*2d 981 (1997). We are thus compelled to set aside the jury's verdict.

## B.

█ Even if we assume that defendant's disheveled state did not prejudice the jury's determination, the government's conduct itself raises the question whether fundamental fairness warrants reversal of defendant's conviction. The doctrine of fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily." *Doe v. Poritz*, 142 *N.J.* 1, 108, 662 *A.*2d 367 (1995) (citation omitted). Although that doctrine is to be applied sparingly, "[i]t is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." *State v. Yoskowitz*, 116 *N.J.* 679, 712, 563 *A.*2d 1 (1989) (Garibaldi, J., concurring and dissenting).

That defendant was denied basic amenities is undisputed. Deprived of food, clean bedding, and running water, defendant was forced to appear in court in a physically degraded state. After a searching review of the record, we have found no identifiable State interest served by such action, and none was offered by the Sheriff's Office. Assuming that the jail truly lacked supplies on the days in question, defense counsel should have been allowed access to his client, subject to reasonable security procedures, to deliver the necessary items.

Simply stated, all persons in the criminal justice system are entitled to their dignity. When a defendant is inexplicably subjected to arbitrary, unfair, and egregious action at the hands of the State, principles of fundamental fairness require our intervention. "We appreciate that the principle of fundamental fairness ... is an amphorous doctrine. We need not, however, explore its parameters because this is such a clear case." *State v. Baker*, 310 *N.J.Super.* 128, 138, 708 *A.*2d 429 (App.Div.1998). Therefore, although fair-trial grounds, standing alone, are sufficient to require reversal of defendant's conviction, we conclude that the doctrine of fundamental fairness would also warrant reversal on the facts presented. We articulate that alternative basis for reversal to guide future parties and the courts in ensuring that the circumstances at issue here are not replicated elsewhere in the system.

### III.

Our holding is not to be understood as establishing reversible error any time a defendant complains about any form of treatment or is denied a preferred standard of care while incarcerated. "Lawful incarceration necessitates the reasonable withdrawal from a prisoner of certain rights normally enjoyed by a person in free society." *State v. Ryan*, 145 *N.J.Super.* 330, 335, 367 *A.*2d 920 (Law Div.1976). No person lawfully incarcerated can expect the same or similar comforts of home. *Ibid.*

Rather, we emphasize that our holding is based on a number of factors not likely to be present in future cases: defendant was deprived of all necessary amenities with no justification by the State; his physical condition was palpable to any reasonable observer; he testified before the jury and thus put his truthfulness directly in issue; and Marquez, the co-defendant, who was apparently neatly groomed because he was free on bail, testified against defendant in what essentially became a battle of credibility. Moreover, the jury presumably believed Marquez's testimony over that of defendant's, as indicated by their acquitting Marquez of the more serious charge in the indictment.

Although we do not envision this record repeating itself, we take this occasion to comment generally on the responsibilities of a trial court in preserving fairness in all aspects of a trial. In *State v. Zhu*, a recent decision involving heightened security measures at a high-risk trial, we instructed that, "although the Sheriff is the presumed expert in these matters and has primary responsibility to provide for security, it is the non-delegable duty of a trial court ultimately to approve such measures consistent with constitutional protections to which all defendants are entitled." *Zhu, supra*, 165 *N.J.* at 557, 761 *A.*2d 523.

 By analogy, the trial court is responsible for assuring that the presumption of innocence is not lost at any stage in the proceedings because of extraneous, impermissible factors such as a defendant's physical appearance. As noted in a prior opinion of this Court:

> The judicial branch has an overarching constitutional responsibility to guarantee the proper administration of justice, and particularly, the administration of criminal justice. In numerous contexts, we have remarked upon the independent obligation of the court to take all appropriate measures to ensure the fair and proper administration of a criminal trial. A vital aspect of this responsibility is the court's duty to preserve the jury's impartiality throughout the trial process.
>
> Judicial solicitude for the impartiality of the jury finds expression in a variety of settings, *e.g.*, impanelling of jury; examination of jurors; challenge for cause; challenge to impanelled juror; jury instructions; cautionary instructions. Further,

the court has an independent duty to act swiftly and decisively to overcome the potential bias of a jury from outside influences.

[*State v. Williams*, 93 *N.J.* 39, 62–63, 459 *A.2d* 641 (1983) (internal citations omitted).]

In furtherance of their responsibilities, trial courts possess inherent power and may, for example, direct Sheriff's officers or other law enforcement agents to provide basic amenities to those entrusted to their care. *State v. Abbati*, 99 *N.J.* 418, 428, 493 *A.2d* 513 (1985) (discussing contours of judiciary's inherent power "to fashion needed and appropriate remedies"). Similarly, the trial court is authorized to give a cautionary charge in any case in which it reasonably concludes that the physical condition of the accused may impermissibly influence the jury's verdict. *Ibid.* That charge is advisable in that circumstance. Lastly, to assist in effective appellate review, trial courts must create an appropriate record whenever these issues arise. *Zhu, supra,* 165 *N.J.* at 557, 761 *A.2d* 523. Here, the trial court conducted a brief hearing on the record, which enabled the court to determine the validity of defendant's complaints outside the presence of the jury. That was the appropriate procedure under the circumstances in this case.

## IV.

We reverse the judgment of the Appellate Division to the extent that it rejected defendant's fair-trial claims. We set aside the jury's verdict and remand the matter for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.