827 A.2d 1063

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOHNNIE A. DAVENPORT, DEFENDANT–APPELLANT.

Argued March 4, 2003—Decided July 30, 2003.

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Brody* and *Joan T. Buckley,* Designated Counsel, on the letter briefs).

*Steven J. Zweig,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Bennett A. Barlyn,* Deputy Attorney General, of counsel and on the brief).

The opinion of the Court was delivered by

LaVECCHIA, J.

In this appeal we address whether a defendant's right of self-representation has been infringed. Specifically, we must consider whether the trial court's restrictions on defendant's movements within the courtroom, which prevented his physical presence at sidebars that were conducted during jury selection and trial with the assistance of standby counsel, prevented defendant from exercising his right to represent himself.

I.

The facts are summarized from the trial record. At the time of his arrest, defendant Johnnie Davenport was a thirty-three-year-old resident of Neptune Township. In the weeks prior to his arrest, the Neptune police were engaged in an ongoing investiga-

tion into what they believed was an extensive drug-trafficking network with defendant at the helm. On January 9, 1997, acting on information obtained from several informants as well as evidence from a controlled purchase, the police obtained a search warrant for defendant's home and person. The following morning, at 5:00 a.m., eighteen Neptune police officers and Monmouth County Prosecutor's Office Narcotics Strike Force members assembled outside defendant's residence, waiting for him to return home. The police were in full protective gear, anticipating the possibility of gunfire. Defendant returned between 6:30 and 7:00 a.m. Shortly thereafter, eight to ten officers approached the house, broke through the door with a battering ram, and announced their presence and that they had a search warrant. Defendant, who was over six feet tall and weighed approximately three hundred pounds, retreated into his bedroom, slamming the door shut. As the officers broke through the door, they observed defendant lunge toward a shoebox on the floor. Before he could reach the box, multiple officers subdued, arrested, and handcuffed him. The shoebox was found to contain two firearms.

An ensuing search revealed large amounts of drugs, money, and firearms in and about the bedroom. According to Police Sergeant Joseph Burst, defendant, although recalcitrant at first, became cooperative after being subdued and seemed resigned to his fate. Indeed, defendant told Burst that the stress of running a drug operation was keeping him awake at night and that he was "relieved" and "glad it was over." Shortly after his arrest, defendant signed a *Miranda* waiver form, and thereafter acknowledged ownership of the drugs, money, and weapons found. Continuing to cooperate, defendant outlined the history of his drug operations since 1988. Defendant explained that he began his career dealing cocaine out of a warehouse in Asbury Park, selling up to a kilogram per week. He moved his operation and began selling drugs out of the apartments of acquaintances, offering a deal whereby defendant would pay the rent and utilities on the apartment if he were permitted to use it to sell drugs. By the time of his arrest, defendant's operation had grown large. He

stated that he was purchasing about $22,000 of cocaine per week in New York City, and employing about forty or fifty "street hustlers" who would sell the cocaine and return to him an agreed-upon percentage of earnings.

After giving that detailed oral statement to the police, defendant was transported to the police station, where he gave a corresponding written statement. He was charged with twenty-five drug- and weapon-related offenses, the most serious of which was first-degree leading a narcotics trafficking network, in contravention of N.J.S.A. 2C:35-3, which carries a sentence of life in prison with a mandatory twenty-five-year minimum period of incarceration without parole. Defendant also was charged with fourth-degree aggravated assault and third-degree tampering with a witness, stemming from an alleged assault by defendant on one of his drug dealers and a subsequent attempt by defendant to have that dealer file an affidavit to dismiss the assault complaint.

Defendant elected to represent himself. At a pre-trial hearing conducted on February 3, 1999, the trial court questioned defendant in respect of his desire to proceed pro se. The court specifically called to defendant's attention that he had the right to an attorney, and that one would be appointed for him if he could not afford one. Defendant indicated that he understood his right to an attorney but nonetheless desired to proceed pro se. The court then informed defendant that standby counsel, Paul Escandon (a pool attorney working for the Office of the Public Defender), had been assigned to assist defendant and the court with the proceedings. The court explained to defendant:

> All right. We have Mr. Escandon here as legal adviser. He's only can answer questions for you. I'm not going to have him he can't stand up here and cross-examine witnesses that you don't want to cross-examine. I can't do it that way. You have to represent yourself.
>
> THE DEFENDANT: Yes.

After the court again advised defendant of his right to counsel and defendant reasserted his desire to proceed pro se, the court addressed the security concerns implicated by defendant representing himself:

THE COURT: Okay. I don't know how we're going to begin here. But I think before we begin—go any further, obviously we're going to have some rules as to security.

Mr. Davenport, you are in custody. And I can't change that. I spoke to Lieutenant Collins here today before you came in. I asked him to come up, because I wanted to let him know what the rules are, because the rules are probably going to be a little different.

Usually because people don't usually—people in custody don't usually represent themselves. And I didn't want anything you do to be taken by them as something wrong and then them pouncing on you, to be blunt.

So I talked to Lieutenant Collins and we thought about some things. And I'd like everybody to know what we're doing. Mr. Davenport, you'll be—when you come in the courtroom, obviously you're not going to have handcuffs or shackles. I mean that's a rule.

. . .

You will not be allowed at side bar. So if there's anything that has to be said outside the presence of the jury, we'll either have to let the jury go into the jury room or you can mention it to Mr. Escandon who can speak to me and he would relay a message.

Do you understand?

THE DEFENDANT: Yes.

THE COURT: Okay. I can't have you approach any witness or touch the side bar in any way.

So if you go out to where the jury rail is, you're not to touch the jury rail.

THE DEFENDANT: Will the same hold true for Mr. Peppler [the assistant prosecutor] as well?

THE COURT: Well, Mr. Peppler won't touch the jury rail either. I'll make that a rule.

THE DEFENDANT: And I won't be allowed to approach witnesses.

THE COURT: No.

THE DEFENDANT: This would clearly prejudice me. It would lead to some type of suspicion, I would feel.

THE COURT: Well, I can't help that. But I can't have you approaching witnesses.

Pursuant to this exchange, the court established an arrangement whereby defendant's field of movement would be restricted to an area immediately adjacent to his seat at counsel table. He was not allowed to approach the jury or the witnesses, nor was he permitted to approach the bench for sidebar conferences. Instead, the judge emphasized to defendant that he could either

conduct sidebars via his standby counsel, who would relay messages back and forth between defendant and the court, or defendant could opt to have the jury exit the courtroom whenever he wished to address the court outside the presence of the jury. The court's principal concern was courtroom security—the trial court repeatedly emphasized that defendant would not be permitted to walk around the courtroom, explaining that the security officers would "jump" on defendant if he "went too far."

Jury selection began a few days later. Before bringing the potential jurors into the courtroom, the trial court asked for and received defendant's consent for Mr. Escandon to participate during sidebar conferences on "scheduling" issues. The court then summoned the potential jurors, introduced the lawyers for the State and a codefendant,[1] and explained that defendant would be representing himself with Mr. Escandon serving as his "legal advisor." The court explained that during the voir dire process it would be asking the potential jurors various questions, and that if any juror felt uncomfortable responding publicly, he or she should let the court know and the issue could be discussed at sidebar.

Fifty-eight sidebar conferences were conducted with various potential jurors. Defendant was not physically included in any of them, although Mr. Escandon was present on defendant's behalf. The record indicates that the sidebars generally consisted of a very short colloquy between the court and the potential juror, without input from either side. There were three notable exceptions. In one instance, a juror informed the court that his ex-wife had been charged with and convicted of murder within the past year. In another, the assistant prosecutor informed the court that he was personally acquainted with one of the potential jurors. Finally, in a third instance, a juror told the court that he was currently taking medication for depression. All three times, Mr. Escandon stated that he would relay the information disclosed about the juror to defendant and discuss it with him. The record

---

[1] Defendant's girlfriend was also arrested and tried with defendant. She was represented by counsel and ultimately pleaded guilty midway through the trial.

indicates that defendant did not take any action in any of these instances. The juror who was on medication remained on the jury, but the other two were excused.

The trial lasted nine days, during which there were twenty-one sidebar conferences, ranging from as many as six sidebars in one day of testimony to as few as one. Defendant was again not permitted to be physically present at any of them. The topics addressed at these sidebars ranged from the substantive, such as admissibility of certain evidentiary proffers, to the mundane, such as the scheduling of lunch for the jurors. Defendant never objected to his exclusion from these conferences. However, on several occasions Mr. Escandon left the sidebar conference to relay information to or from defendant, or to determine from defendant whether he had an objection to a proposed course of action. The record also indicates that a number of times when substantive information was being discussed at sidebar, the court excused the jurors and provided defendant with a restatement to ensure his full inclusion.

Apart from his physical exclusion from sidebar discussions, defendant conducted his own defense. Prior to trial, defendant brought various motions and conducted a *Miranda* hearing. At trial, defendant delivered an opening statement to the jury, cross-examined the State's witnesses, called his own witnesses (his mother, a lawyer he had previously consulted, a deputy public defender, a Neptune police officer, and a police detective), and gave a lengthy closing statement in which he argued that his arrest and prosecution were the result of massive police corruption. Defendant also engaged in numerous exchanges with the court on evidentiary and other issues, both in and out of the presence of the jury, and it is clear that several of the sidebar conferences with Mr. Escandon were conducted at defendant's request. For example, defendant sought to enter into evidence a letter, part of which indicated that defendant's current address was the county jail. Mr. Escandon conveyed at sidebar that defendant had requested that the reference to defendant's incarceration be redacted. The court agreed.

Defendant was successful in winning acquittal on ten charges; however, the jury did convict him of numerous drug-related offenses, including first-degree leading a narcotic trafficking network. On that, defendant was sentenced to the mandatory extended term of life imprisonment with a thirty-year period of parole ineligibility. The sentences for defendant's other convictions were all made to run concurrently.

Defendant appealed, and the Appellate Division affirmed in an unpublished decision. The court noted that it was mindful of the "valid security concerns [that] justif[ied] a limitation of [defendant's] movement around the court room [sic]," especially in the context of a first-degree charge that carried a potential term of life in prison. The court recognized defendant's right to "control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." However, the court found that the right to "roam freely throughout the courtroom is not a necessary concomitant ... of the right to appear *pro se*." In the end, the court was satisfied that the jury was at all times aware that defendant was in charge of legal strategy, legal argument, and presentation of evidence, and that nothing done by either the court or standby counsel "could in any way have been interpreted by the jury as a denigration of defendant's right to control and present his own defense."

This Court granted defendant's petition for certification, 174 *N.J.* 191, 803 *A.*2d 1162 (2002), to decide whether defendant's physical exclusion from sidebar conferences violated his constitutional right of self-representation.

## II.

### A.

The United States Supreme Court recognized a defendant's right of self-representation in *Faretta v. California*, finding

the right "necessarily implied by the structure of the [Sixth] Amendment." 422 *U.S.* 806, 819, 95 *S.Ct.* 2525, 2533, 45 *L.Ed.*2d 562, 572 (1975). An accused has the constitutional right to proceed *pro se* when he voluntarily and intelligently waives his right to counsel. *Id.* at 807, 95 *S.Ct.* at 2527, 45 *L.Ed.*2d at 566. The Court also held, however, that a trial court may appoint "standby counsel" to assist the *pro se* defendant. *Id.* at 834 n. 46, 95 *S.Ct.* at 2541 n. 46, 45 *L.Ed.*2d at 581 n. 46 (stating that "[o]f course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary"). And, the trial judge retains the right to terminate self-representation if the defendant engages in "serious and obstructionist misconduct." *Ibid.*

In *McKaskle v. Wiggins,* 465 *U.S.* 168, 104 *S.Ct.* 944, 79 *L.Ed.*2d 122 (1984), the Court expanded on the role of standby counsel. The Court explained that a *pro se* defendant "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id.* at 174, 104 *S.Ct.* at 949, 79 *L.Ed.*2d at 131. However, a *pro se* defendant has no absolute right to bar standby counsel's unsolicited participation. *Id.* at 176, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132. The Court explained that the objectives of *pro se* representation—"the dignity and autonomy of the accused" and "the presentation of what may, at least occasionally, be the accused's best possible defense"—can be achieved "without categorically silencing standby counsel." *Id.* at 176–77, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132; *see also Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.,* 528 *U.S.* 152, 162, 120 *S.Ct.* 684, 691, 145 *L.Ed.*2d 597, 607 (2000) (stating that "standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not seriously undermin[e] the appearance before the jury

that the defendant is representing himself") (citation omitted). To determine whether a defendant's *Faretta* right has been respected, "the primary focus must be on whether the defendant had a fair chance to present his case in his own way .... The specific rights to make his voice heard ... form the core of a defendant's right of self-representation." *McKaskle, supra,* 465 *U.S.* at 177, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132.

 In this vein, the Court placed some limits on the participation of standby counsel:

First, the pro se defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the Faretta right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the Faretta right is eroded.

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear pro se exists to affirm the accused's individual dignity and autonomy.... From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear pro se can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

[*Id.* at 178–79, 104 *S.Ct.* at 951, 79 *L.Ed.*2d at 133–34.]

The Court made explicit that trial judges may appoint standby counsel—even over a defendant's objection—"to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals." *Id.* at 184, 104 *S.Ct.* at 954, 79 *L.Ed.*2d at 137. The Court continued: "Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the pro se defendant's appearance of control over his own defense." *Ibid.*

## B.

 The right to counsel guaranteed under Article 1, paragraph 10 of the New Jersey State Constitution includes the right

of self-representation. That right has been recognized in terms substantially identical and coextensive with federal constitutional rights. In *State v. Crisafi*, 128 *N.J.* 499, 608 *A.*2d 317 (1992), we explained that "[d]efendants possess not only the right to counsel, but the right to dispense with counsel and to proceed *pro se.*" *Id.* at 509, 608 *A.*2d 317 (citing *Faretta, supra*, 422 *U.S.* at 806, 95 *S.Ct.* at 2525, 45 *L.Ed.*2d at 562). Although we have not addressed the proper role of standby counsel, the Appellate Division did in *State v. Gallagher*, 274 *N.J.Super.* 285, 644 *A.*2d 103 (App.Div.1994), characterizing the role consistent with its depiction in *McKaskle*. The court explained that "[s]tandby counsel may be appointed to provide the defendant with advice and assistance and to facilitate communications with the court," but that "the Constitution ... 'impose[s] some limits on the extent of standby counsel's unsolicited participation.'" *Id.* at 296, 644 *A.*2d 103 (quoting *McKaskle, supra*, 465 *U.S.* at 177, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132–33). Echoing *McKaskle*, the Appellate Division determined that

[f]irst, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present, and second, participation by standby counsel should not be allowed to destroy the jury's perception that the accused is representing himself. A defendant's right of self-representation plainly encompasses certain specific rights to have his voice heard. He must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.

[*Id.* at 297, 644 *A.*2d 103 (citations omitted).]

### III.

 Defendant contends that his exclusion from the sidebar conferences violated his *Faretta* right. In order to establish the asserted violation, defendant must show that the participation of standby counsel either (1) deprived him of actual control over the case that he presented to the jury, or (2) destroyed the perception of the jury that defendant was representing himself and in control of the case. See *McKaskle, supra*, 465 *U.S.* at 178–79, 104 *S.Ct.* at

951, 79 *L.Ed.*2d at 133–34; *Gallagher, supra,* 274 *N.J.Super.* at 297, 644 *A.*2d 103.

A.

In respect of the first prong, the record in this matter fairly shouts that it was defendant, and defendant only, who controlled the content and presentation of his defense. Defendant raised and argued pretrial motions, and conducted his own opening, cross-examinations, direct examinations, and closing. In short, defendant exercised control over every substantive phase of his defense. His only argument is that his physical exclusion from the sidebar conferences effected a loss of control over his defense.

 Of the fifty-eight sidebars that took place during voir dire, the overwhelming majority of them consisted of short colloquies between the judge and a potential juror over whether the potential juror could sacrifice about a month off from work without undue hardship. The record reflects that generally neither the prosecuting attorney, nor defendant's standby counsel, nor counsel for the codefendant provided any input to the brief conversations that occurred between the court and the potential juror. As noted above, on the rare occasions that something more substantive than time considerations and trial scheduling was discussed, the record indicates that Mr. Escandon relayed the information to defendant, who opted to take no action. Although we find much to commend in the dissent's suggestion that a "struck jury" could have been employed, we are unpersuaded from this record that the failure to do so worked any deprivation to defendant concerning his control of a defense of his choosing.

The sidebars during trial present a closer call. Again, as noted, most were mundane in nature and dealt with matters such as scheduling of witnesses or jury breaks. However, defendant points to three sidebars in particular, the exclusion from which he alleges violated his *Faretta* right.

██ Defendant points to one sidebar in which standby counsel, the prosecuting attorney, and the court had a discussion about whether and how defendant would testify without an attorney. This argument may have had some merit, if not for the fact that immediately after the sidebar, the court dismissed the jury and proceeded to address with defendant the entire contents of the sidebar discussion that raised the issue. The court then had a lengthy discussion with defendant on the record regarding whether he planned to testify. In addition, on numerous other occasions in open court the judge discussed with defendant the procedure under which he would testify without an attorney, although we note that defendant ultimately elected not to testify. Under those circumstances, we find no merit to the contention that defendant was undermined in his ability to control the content and presentation of his own defense.

██ Two sidebars touched on evidentiary issues, and during each the court asked standby counsel if he knew defendant's purpose in pursuing a certain line of questioning. Defendant asserts that those sidebars resulted in standby counsel conjecturing and overstepping his bounds by inappropriately speaking for defendant. However, defendant's absolutist position ignores the flexibility found to be essential in situations involving a *pro se* defendant and standby counsel. As noted in *McKaskle, supra,* the "categorical[ ] silencing [of] standby counsel" is not necessary to preserve a defendant's *Faretta* right, and there is no "absolute bar on standby counsel's unsolicited participation." 465 *U.S.* at 176–77, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132.

In light of the valid security concerns attendant to the trial of an alleged drug kingpin facing a life sentence, we believe that this is one of those situations in which the participation by standby counsel was appropriate, and would have been appropriate even had defendant objected.[2] However, in that respect, we note that

---

[2] In this regard, we acknowledge that the trial court's security concerns could have been better articulated on the record. We are mindful, however, that, in

defendant never once objected to the participation of standby counsel at sidebars. When the trial court asked defendant if he understood that he would not be allowed at sidebar, he replied "yes." In *Faretta, supra,* representation by unwanted counsel was deemed constitutionally impermissible "unless the accused has acquiesced in such representation." 422 *U.S.* at 821, 95 *S.Ct.* at 2534, 45 *L.Ed.*2d at 573. The Court clarified the issue of acquiescence in *McKaskle,* when it stated that "a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." 465 *U.S.* at 182, 104 *S.Ct.* at 953, 79 *L.Ed.*2d at 136; *see also Myers v. Johnson,* 76 *F.*3d 1330, 1334 (5th Cir.1996) (stating that "[o]nce a pro se defendant invites or acquiesces in substantial participation by standby counsel, even if he insists that he is not waiving his *Faretta* rights, he abandons his right to later complain that counsel interfered with his presentation of his defense"). Although we need not decide whether defendant's actions constituted a waiver of his *Faretta* right, we note that his lack of objections and acquiescence in the courtroom protocol established by the trial court erode his current assertion that standby counsel overstepped his bounds.

### B.

The second prong of the *McKaskle* test for preservation of the *Faretta* right addresses whether the participation of sidebar counsel "destroy[ed] the jury's perception that the defendant [was] representing himself." 465 *U.S.* at 178, 104 *S.Ct.* at 951, 79 *L.Ed.*2d at 133. Just as we are persuaded that defendant controlled the content and presentation of his defense, we are convinced also that the jury was fully aware of that reality.

---

addition to the serious charges defendant was facing, the trial court was fully aware of the violent circumstances surrounding defendant's arrest, as well as the pending assault charges.

Before even selecting a jury, the trial court informed the potential jurors that "Mr. Davenport is representing himself. He appears pro se, but we have Mr. Paul Escandon who is going to act as legal advisor to Mr. Davenport." When trial began, as noted, defendant delivered the opening statement, cross-examined the State's witnesses, called and examined his own witnesses, and delivered a lengthy closing statement. In addition, although defendant was not physically present at sidebars, the jury on numerous occasions witnessed Mr. Escandon relay information back and forth between defendant and the court at sidebar conferences. This is wholly consonant with a perception of defendant representing himself, with Mr. Escandon as his legal advisor. Finally, while charging the jury, the court again reminded them that Mr. Davenport had represented himself, stating that "Mr. Escandon has been appointed by me to be present and to assist Mr. Davenport, if Mr. Davenport wishes, concerning legal procedures in this case. He hasn't addressed you. He will not address you. And he is not the attorney for Mr. Davenport. So please keep that in mind."

Thus, the trial judge informed and repeatedly reminded the jury that defendant was representing himself. And, defendant conducted his entire defense, apart from being physically present at sidebar. In these circumstances, we are not convinced that a reasonable jury would form any belief other than that defendant was representing himself. See *id.* at 183, 104 *S.Ct.* at 953–54, 79 *L.Ed.*2d at 136–37 (explaining that, when standby counsel "introduc[es] evidence or object[s] to testimony, ... [the] likelihood that the defendant's appearance in the status of one defending himself will be eroded is ... slight, and in any event it is tolerable"). Defendant's *Faretta* right, therefore, was not violated.

We note the dissent's emphasis that a harmless error analysis is not appropriate when the right of self-representation is concerned. *Post* at 312. The point is inapposite, however, in light of our finding that whatever erosions were occasioned on defendant's *Faretta* right were tolerable, and did not rise to the level of a

violation of the right. We need not consider the effect of finding a *Faretta* violation on defendant's conviction, because we find no such violation.

## IV.

Although we have not before addressed the issue of a defendant's right to attend sidebar conferences, the issue has been addressed in several out-of-jurisdiction cases. In *United States v. Mills*, 895 *F.*2d 897 (2d Cir.), *cert. denied*, 495 *U.S.* 951, 110 *S.Ct.* 2216, 109 *L.Ed.*2d 541 (1990), the Second Circuit addressed the question in circumstances substantially identical to those presented here. The court explained that the defendant "conduct[ed] every aspect of his defense .... [He] made the opening statement; he cross-examined the government's witnesses; he examined his own witnesses[;] ... [he] himself made most of whatever defense objections were made to the government's questions; and [he] made his own closing argument." *Id.* at 905. Thus, the issue there was the same as here: whether the exclusion from sidebars deprived the defendant of his *Faretta* right. The Second Circuit ultimately concluded that the *Faretta* right was not violated, "finding no indication that [the defendant] did not control and guide his defense and only a minuscule risk that the jury did not perceive [the defendants] control." *Ibid.* Notably, in *Mills* the defendants standby counsel made legal arguments before the trial court on a variety of motions, unlike here where defendant argued all of his own motions. See *id.* at 904.

Other courts have reached the opposite conclusion. *See, e.g., People v. Rosen*, 81 *N.Y.*2d 237, 597 *N.Y.S.*2d 914, 613 *N.E.*2d 946, 949–50 (1993); *Snowden v. State*, 672 *A.*2d 1017, 1022 (Del.1996); *United States v. McDermott*, 64 *F.*3d 1448, 1454 (10th Cir.1995), *cert. denied*, 516 *U.S.* 1121, 116 *S.Ct.* 930, 133 *L.Ed.*2d 857 (1996); *see also Oses v. Massachusetts*, 961 *F.*2d 985 (1st Cir.), *cert. denied*, 506 *U.S.* 954, 113 *S.Ct.* 410, 121 *L.Ed.*2d 334 (1992) (reversing conviction where defendant was excluded from sidebars, but also noting that defendant was forced to appear bound

and gagged before jury and that court made improper disparaging remarks about defendant). The decision in *McDermott, supra,* reversed a conviction based on facts (exclusion from approximately thirty trial sidebars) that were similar to those here. 64 *F.*3d at 1454. Although it reversed, the Tenth Circuit noted that under *McKaskle,* some unsolicited participation will merely "erode" the *Faretta* right. *Ibid.* The court explained that "erode" is not synonymous with "violate," and that therefore some "minor incursions" will fall short of a *Faretta* violation. *Ibid.* Thus, a "fact-specific" inquiry is necessary to distinguish the minor incursions of *Mills*-type cases from the more significant violation presented in *McDermott. Ibid.*

Applying a fact-sensitive analysis in this appeal, we are persuaded that this case falls closer to *Mills* than *McDermott* on the *Faretta* continuum. Although reasonable minds can differ, we are convinced based on the record that defendant remained in full control of the content and presentation of his case throughout the trial, and that the jury perceived that reality. Whatever incursions the participation of standby counsel occasioned upon defendant's *Faretta* right were minor erosions, and did not rise to the level of a denial of the right of self-representation.

## V.

We cannot conclude without noting our concern that the exclusion of defendant from sidebars may have created the perception in the mind of the jury that defendant was dangerous, or not to be trusted. See *State v. Maisonet,* 166 *N.J.* 9, 17, 763 *A.*2d 1254 (2001) (stating that "trial courts have a duty to scrutinize closely those practices that pose a threat to fairness and do not serve an essential state purpose") (citation omitted). Nonetheless, that is a regrettable consequence of the obligation of the trial court, regardless of whether a defendant is *pro se* or not, to fashion "proper security measures within the courtroom and . . . [to take action] to protect the jury, [defendants,] counsel, witnesses, and members of the public." *State v. Zhu,* 165 *N.J.* 544, 557, 761 *A.*2d

523 (2000) (citation omitted). In short, a defendant's exercise of his right to represent himself is just that; serving as his own lawyer does not unfetter him from restrictions placed upon his movements by necessary and reasonable security measures. See *Martinez, supra,* 528 *U.S.* at 162, 120 *S.Ct.* at 691, 145 *L.Ed.*2d at 607 (stating that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer").

Although we find no constitutional violation in the manner in which this trial was conducted, we acknowledge the handling of the sidebars is a nettlesome problem that will require some creativity by the trial bench. See *Martinez, supra,* 528 *U.S.* at 164, 120 *S.Ct.* at 692, 145 *L.Ed.*2d at 608 (Breyer, J., concurring) (stating that "judges closer to the firing line have sometimes expressed dismay about the practical consequences of [the holding in *Faretta*]"). We hold today that a defendant's physical presence at sidebar conferences is not an absolute requirement in order to comport with the *Faretta* self-representation right, so long as the exclusion does not deprive the defendant of meaningful participation in the content of the sidebars through his standby counsel representative. Nonetheless, trial courts that confront this issue in the future should explore every avenue to ensure that defendants can participate in sidebars to the fullest extent possible without compromising courtroom security. This may be accomplished, in appropriate circumstances, through defendant's physical presence at sidebar when safety is not a concern, through minimal use of standby counsel as a conduit, by sending the jury to the jury room and having the discussion in open court (as was done on several occasions here), or even through advances in courtroom technology. *See, e.g., State v. Cook,* 330 *N.J.Super.* 395, 415, 750 *A.*2d 91 (App.Div.), *certif. denied,* 165 *N.J.* 486, 758 *A.*2d 646 (2000) (explaining that defendant who was not permitted to be physically present at sidebars "was given use of a wireless listening device whereby he could sit at counsel table" and listen to what was being discussed at sidebar). In circumstances in

which trial courts determine that defendants should not be allowed at sidebar, we expect that the legitimate security concerns that necessitate such a finding will be detailed clearly on the record.

## VI.

The judgment of the Appellate Division is affirmed.

ALBIN, J., dissenting.

On the charges arrayed against him, Johnny Davenport faced a sentence of life imprisonment. The trial court acknowledged that Davenport "steadfastly" invoked his right to counsel and granted his request to proceed *pro se*. The Sixth Amendment and Article I, paragraph 10 of the New Jersey State Constitution conferred on Davenport the right to represent himself—to decide his own fate in the courtroom, however unschooled in the law and ill-suited he was to do so. *Faretta v. California*, 422 *U.S.* 806, 807, 95 *S.Ct.* 2525, 2527, 45 *L.Ed.*2d 562, 566 (1975); *State v. Crisafi*, 128 *N.J.* 499, 508–09, 608 *A.*2d 317 (1992). The right of self-representation reflects the preeminent value our system of justice places on the dignity of the individual, including the accused whose individual autonomy is respected in matters concerning life and liberty. The accused in a criminal trial is granted "the right to make his defense" because "it is he who suffers the consequences if the defense fails." *Faretta*, *supra*, 422 *U.S.* at 819–20, 95 *S.Ct.* at 2533, 45 *L.Ed.*2d at 572–73. In exercising that right, Davenport was entitled to control and present his defense and to participate in a meaningful way in every stage of the proceedings. In the presentation of his defense, Davenport had the right to make his own legal arguments without the filter of an intermediary, including standby counsel assigned to him by the court.

The trial court denied Davenport the opportunity to represent himself at seventy-nine sidebars, fifty-eight during jury selection and twenty-one during trial, at which important legal decisions were made without his voice being heard. Moreover, the court barred Davenport from sidebars without ever articulating the

security reasons for doing so or exploring alternative means that would have permitted Davenport to participate in the matters discussed at sidebar. In my opinion, the trial court impermissibly infringed on Davenport's right to "make his defense" and to project to the jury that he alone was in control of his legal fate. Despite the overwhelming evidence of his guilt, I would reverse Davenport's conviction because he did not receive the trial guaranteed to him by our federal and state constitutions. I, therefore, respectfully dissent.

*Faretta v. California, supra,* firmly established that a defendant has a constitutional right to represent himself. *Faretta* recognized that "although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " *Id.* at 834, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581 (quoting *Illinois v. Allen,* 397 *U.S.* 337, 350–51, 90 *S.Ct.* 1057, 1064, 25 *L.Ed.*2d 353, 363 (Brennan, J., concurring)). In *McKaskle v. Wiggins,* 465 *U.S.* 168, 178, 104 *S.Ct.* 944, 951, 79 *L.Ed.*2d 122, 133 (1984), the Supreme Court made clear that a *pro se* defendant must have a meaningful opportunity to participate in his own defense, even if standby counsel is assigned to provide assistance. The right of self-representation encompasses the right of a *pro se* defendant "to have his voice heard." *Id.* at 174, 104 *S.Ct.* at 949, 79 *L.Ed.*2d at 131. That right also allows him "to control the organization and content of his own defense, to make motions, *to argue points of law, to participate in voir dire,* to question witnesses, and to address the court and the jury at appropriate points in the trial." *Ibid.* (emphasis added). Additionally, *McKaskle* plainly states that standby counsel, assigned to assist a *pro se* defendant, may not take control of the case without that defendant's consent. Therefore, "[i]f standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the *Faretta* right is eroded." *Id.* at 178, 104 *S.Ct.* at 951, 79 *L.Ed.*2d at 133. Moreover, "participation

by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Ibid.* That is so because "[t]he defendant's appearance in the status of one conducting his own defense is important ... to affirm [his] individual dignity and autonomy." *Ibid.*

Courts have addressed whether excluding a *pro se* defendant from sidebars is a violation of the Sixth Amendment right of self-representation. In one such case, the Court of Appeals for the Tenth Circuit reversed a *pro se* defendant's conviction and granted a new trial based on his exclusion from thirty sidebars at trial. *United States v. McDermott,* 64 *F.*3d 1448, 1454 (10th Cir.1995). In *McDermott,* the trial court excluded the defendant because he "was not equipped to handle purely legal matters and bench conferences centered on them." *Id.* at 1452. The Tenth Circuit concluded that the *pro se* defendant's exclusion from sidebars was not "an insignificant incursion on his *Faretta* right." *Id.* at 1454.

I begin with the assumption, accepted by our courts, that it is highly unlikely a *pro se* defendant will represent himself as effectively as a lawyer, who brings his training, experience, and detachment to the task. In that sense, it is difficult to conclude that a defendant would be disadvantaged or prejudiced by the assistance of skilled counsel. Therefore, a traditional harmless error analysis would never serve to vindicate the constitutional right of self-representation. "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle, supra,* 465 *U.S.* at 177 n. 8, 104 *S.Ct.* at 950 n. 8, 79 *L.Ed.*2d at 133 n. 8. We respect a defendant's decision to represent himself, not because we believe it is a wise one, but because it is his choice and his life. *Faretta, supra,* 422 *U.S.* at 834, 95 *S.Ct.* at 2540–41, 45 *L. Ed.*2d at 581. Applying those principles to this case leads me to

the irresistible conclusion that Davenport was denied his *Faretta* rights.

After granting Davenport the right to represent himself, the court, on its own, appointed standby counsel to serve as his "legal advisor." Based on Davenport's pending charges and his failure to make bail, the trial judge ordered him to remain at counsel table throughout the proceedings. The trial court told Davenport that he would "not be allowed at sidebar" and advised him that "anything" that he had to say out of the presence of the jury would require removal of the jury from the courtroom or relaying the message to the court through standby counsel. Although Davenport agreed to follow the court's instructions, he neither consented nor failed to object to "the courtroom protocol established by the trial court," *ante* at 305, as suggested by the majority. Davenport pressed the point as far as decorum permitted without engaging in contumacious conduct, as is evident from the following colloquy:

Davenport: But I'm not a savage, I'm not a beast. I can control—

The Court: You're in custody and you can't go walking around this courtroom. Okay? I'm just telling you that right now.

. . . .

The Court: It's my order that you not walk around the courtroom. It's as simple as that.

Davenport: Or they're going to beat me up.

The Court: It's as simple as that. You may not walk around the courtroom, you may not approach witnesses.

Davenport: Okay. I understand about approaching the witnesses.

The Court: And if you start moving around, there's going to be a problem with the security. And I had the head of security here yesterday to explain the situation to you.

Davenport: Not to me.

The Court: We cannot have a prisoner walking around this courtroom. There's not going to be—

Davenport: I'm a *pro se* litigant, I think that would—

The Court: You are also a prisoner in custody, and security comes first at this point.

Davenport: If I bailed out tomorrow, would it be different[?]

The Court: If you got bailed out tomorrow, it would certainly be different.

Davenport: Can you lower it?
The Court: No, sir.

Any further objection by Davenport would have been futile and likely considered by the court as contemptuous. Davenport adequately preserved his objection to the court's order excluding him from the discussions at sidebar. Moreover, the court's concern appeared more focused on Davenport's bail and custodial status than whether he was truly a security risk. Davenport at no time before or during trial engaged in disruptive behavior.

At the majority of the fifty-eight sidebar conferences during jury selection, the trial court simply excused a potential juror. That, however, did not justify Davenport's absence from those conferences, particularly in light of the court's failure to consider any alternative to confining Davenport to counsel table. The potential jurors in the courtroom must have been left with the unmistakable impression that Davenport could not be trusted to approach sidebar and that he did not retain full control over his defense. The trial court could have eliminated the need for sidebars during the jury selection process by employing the technique of a "struck jury." In that process, jurors as a group are given a general orientation and then each potential juror is questioned individually in the courtroom, but outside the presence of the other potential jurors. Accordingly, no sidebars are required. *See, e.g., State v. Dixon,* 125 *N.J.* 223, 245–47, 593 *A.*2d 266 (1991) (discussing "struck jury" process with approval). That procedure undoubtedly would have taken more time, but it would have preserved Davenport's constitutional right to control his defense, both in fact and as perceived by those who were ultimately chosen as jurors.

Additionally, the court excluded Davenport from every sidebar conference during trial, twenty-one in all. The sidebar conferences, attended by standby counsel, ranged from logistical planning to procedural and substantive points of law, and included discussion of Davenport's use of a grand jury transcript for impeachment purposes, his use of a police report during cross-examination, his solicitation of hearsay testimony, his request to

ask an omitted question, his attempt to use a document to impeach a witness, the purpose and relevance of his questions, whether and how he might testify, his appreciation of the significance of his decision not to testify, a juror's falling asleep during testimony, redacting exhibits, the timing of the admission of a photograph, and the substance of the jury charge. On only seven occasions did standby counsel leave sidebar to relay information to Davenport. Even though Davenport was seated but a few feet away during those sidebars, standby counsel repeatedly speculated as to his trial strategy instead of asking him.

At one sidebar conference, standby counsel and the court conferred on Davenport's tentative decision not to testify and the strategic reasons for that decision. That conference, which was held at sidebar even though the jury was not in the courtroom, raises the additional question of whether standby counsel communicated privileged information to the court:

The Court: You see the problem is, I think he realizes that maybe [not testifying] is his point one on appeal. I think that's what he does. And I'm really kind of concerned. Maybe we should never have asked him the question [of how he would testify without counsel representing him] anyway, but that's the situation. I think you ... told me a couple of days ago that he really didn't want to testify.

[Standby Counsel]: Yeah. To the best of my knowledge, early on[,] earlier last week he expressed to me that he wasn't planning on testifying, you know.

The Court: Well, we discussed this after I told him he had to write the questions [for his direct examination].

[Standby Counsel]: This morning when you excused the jury he started talking about it a little more and he mentioned to me, well, you know, how can I possibly take the stand and you question me on scripted, on me—on my handwritten questions. It is going to take away from the sting, he said, of effective direct examination. And so, you know, that's my concern. That's why I'm not going to testify.

And we also talked about the fact that his prior convictions what would—what of that would come in. He wasn't so concerned about that as much as he was about, you know, my—how would I be asking him questions. Whether it would be from a rehearsed script by him having written them out or would I be allowed to be, for lack of a better word, ad libing and using my own creative thought.

. . . .

The Court: So I think this is a difficult question here. And I think I must have mentioned at least two or three times during this trial that he was supposed to

have those things prepared. And if he had a problem with it, he should have mentioned it then.

[Standby Counsel]: Right.

The court eventually expressed concern that Davenport was not privy to the colloquy and summarized the sidebar conference for Davenport's benefit. In a number of instances, the court and standby counsel conferred over legal issues at sidebar. Only later was Davenport advised of the contents of the discussions. The sidebar conferences involved critical, not just mundane, issues concerning the conduct of the trial.

What is regrettable is that Davenport's exclusion from the legal discussions at the sidebar conferences was completely unnecessary. The court has broad discretion to address security concerns in the conduct of a trial. Before excluding a *pro se* defendant from sidebar conferences, however, the court should articulate the precise security problem and then consider measures to accommodate the *pro se* defendant's constitutional right to participate in legal argument. The court could have withheld addressing some of the legal arguments and waited for an appropriate break to excuse the jury to discuss the issues directly with Davenport. The Court also could have considered the use of available technologies for including Davenport in the sidebar conferences. *See, e.g., State v. Cook,* 330 *N.J.Super.* 395, 415, 750 *A.*2d 91 (App.Div.) (affirming use of "wireless electronic listening system whereby [*pro se* capital defendant] could sit at counsel table with one of his attorneys while the other went to sidebar"), *certif. denied,* 165 *N.J.* 486, 758 *A.*2d 646 (2000). The court did nothing to accommodate Davenport's constitutional right—to argue significant legal points raised at sidebar.

Davenport is now serving a life sentence as a result of his conviction at trial. That conviction was obtained while Davenport was denied an inestimable right—the right to have his own voice heard at critical points of the trial and to rise or fall on his own defense. I, therefore, dissent.

Justice LONG joins in this dissent.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO, LaVECCHIA, and ZAZZALI—5.

*Dissenting*—Justices LONG and ALBIN—2.